IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANET ASAY,                                    Civil No. 06-6017-AA
                                               OPINION AND ORDER

        Plaintiff,

    vs.

ALBERTSONS, INC., a corporation;
JACKIE MARTINI; JOHN DOES 1& 2,

        Defendants.
_____

Claud Ingram
Attorney at Law
P.O. Box 2937
Eugene, OR 97402
    Attorney for plaintiff

David J. Riewald
Bullard Smith Jernstedt Wilson
1000 SW Broadway, Suite 1900
Portland, OR 97205

Kenneth J. Diamond
Steven H. Winterbauer
Adam G. Cuff
Winterbauer & Diamond P.L.L.C.
1200 Fifth Avenue, Suite 1910
Seattle, WA 98101
    Attorneys for defendant

Page 1 - OPINION AND ORDER

AIKEN, Judge:

In this diversity tort case, plaintiff Janet Asay alleges Oregon state law claims of intentional infliction of emotional distress (IIED), fraud, and false imprisonment against her former employer, defendant Albertsons, including Albertsons' employees defendants Jackie Martini and John Does 1 & 2 (identified in the pleadings as Shannon Poe and Melinda Boothe).  The case is before this court on defendants' motion for summary judgment. The court held oral argument on April 16, 2007. Defendants' motion is granted in part and denied in part.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law determines whether a fact is material.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The authenticity of the dispute is determined by whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the burden of proving the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  If the moving party shows the absence of a genuine
issue of material fact, the nonmoving party must go beyond the
pleadings and identify facts which show a genuine issue for
trial.  Id. at 324.

Special rules of construction apply to evaluating summary
judgment motions: (1) all reasonable doubts as to the existence
of genuine issues of material fact should be resolved against the
moving party; and (2) all inferences to be drawn from the
underlying facts must be viewed in the light most favorable to
the nonmoving party.  T.W. Elec., 809 F.2d at 630.

                            **BACKGROUND**

Plaintiff began working for Albertsons in 1991 as a deli
clerk at one of the Eugene, Oregon stores.  In 1995, plaintiff
was promoted to the position of service deli manager and
transferred to the Albertsons store in Bend, Oregon where she
worked until her termination on May 16, 2005.  From plaintiff's
hire in 1991 until 2004, plaintiff received consistently positive
performance reviews from Albertsons.  In 2004, defendant Jackie
Martini became the Bend store director.

In 1995, upon plaintiff's transfer to Bend, she observed
that the out-of-date and accidentally opened deli food products
were placed in the back room before later being placed in the
garbage containers.  Employees frequently consumed such out-of-
date and opened merchandise.  Plaintiff testified that she also

Page 3 - OPINION AND ORDER

observed the store director that preceded Martini, Lee Lowery, participate in this practice.  In 2000, Albertsons' policy of throwing away out-of-date and non-saleable products was replaced by donation of these goods to charitable organizations.  Despite Albertsons changed practice, employees continued to consume out-of-date products and this fact was known by the store director.

Albertsons alleges that it is against Albertsons' policy for store employees to take or consume food products without paying for them.  It is also against store policy for employees to take, consume, or purchase spoiled, out of code, or damaged products.  Nevertheless, plaintiff testifies that it was the practice of employees at the Bend store to consume out-of-date and non-saleable product.

In August 2004, defendant Jackie Martini became the Bend store director, and the former store director transferred to a position as head of the meat department in the Bend store.  Plaintiff testified that Martini commented that there were too many highly paid employees at the Bend store and indicated to plaintiff that something needed to be done about it.  Martini also asked when plaintiff intended to retire, suggesting to plaintiff that she should retire soon.  Plaintiff further testified that Martini told plaintiff that she could not possibly work as hard as she had for many more years, stating, "we'd just have to find a way to get you retired."  Martini also commented

Page 4 - OPINION AND ORDER

on plaintiff's lack of computer skills and warned that plaintiff could be replaced.

At plaintiff's first performance review under the supervision of store director Martini, Martini had an observer present while she criticized plaintiff and told plaintiff that she (Martini) had been sent to the Bend store to "clean it up." Plaintiff testified that Martini described plaintiff as a "work horse" but that she (Martini) wanted more from plaintiff.  Based on Martini's comments, plaintiff believed that she was on Martini's "hit list."

On another occasion, Martini handed out a pamphlet titled "Enthusiasm! The Action Handbook," by Norman Vincent Peale, and instructed all department heads to read it.  Plaintiff was offended by the pamphlet's religious content, and complained to Martini.  Plaintiff testified that Martini made other comments to single out plaintiff's religion such as the fact that plaintiff does not drink coffee.

On May 10, 2005, plaintiff was told by Martini to go to the store director's office, where two members of Albertsons' Loss Prevention Department, Shannon Poe and Melinda Boothe, were waiting to interview plaintiff.  Plaintiff testified that she was told by Poe that the Loss Prevention Department was investigating the problem of employees eating products and exchanging food products with other departments within the store.  Poe asked

plaintiff if she were aware of events that had occurred at the
Albany store that led to employees losing their jobs.  Plaintiff
testified that she was unaware of such events.  Poe told
plaintiff that he was trying to find solutions to the problem and
that his mission was not punitive.  He also told plaintiff that
if she cooperated with him and helped with the solution,
plaintiff would not lose her job.

Poe insisted to plaintiff that surveillance cameras in the
store showed plaintiff eating products.  Plaintiff, however,
denied eating any new products or exchanging any new products
with other departments, except as part of cross merchandising
between departments.  Plaintiff testified that Poe continued to
repeat that Albertsons wanted plaintiff to be part of the
solution to the loss prevention problem.  Poe asked plaintiff is
she would put an end to the practice, and plaintiff agreed.  Poe
again reiterated to plaintiff that it was bad business for
Albertsons to be punitive in dealing with problems such as this,
and that if plaintiff were cooperative by helping to end the
practice, she would be setting a good example for her employees
and proving her loyalty and trustworthiness to Albertsons.

As a result of the meeting, plaintiff admitted that she had
consumed a small amount of out-of-date products, as was the
practice in the store and known to store management.  Plaintiff
testified that she signed a statement, the contents of which were

dictated by Poe, under duress and intimidation.  The statement included a promise that she would pay an amount determined by Poe for eating Albertsons' food products without paying for them. Plaintiff understood that this amount owed would be taken from her future earnings.  Plaintiff testified that based on Poe's assurances, she believed she had an opportunity for future earnings with Albertsons.  Poe determined the total amount owed by plaintiff to Albertsons by estimating her daily average food products consumption and multiplying that amount over the years of her employment with Albertsons.  Several other employees "dictated" nearly identical letters.

Plaintiff testified that Poe told plaintiff what to write, indicating that he thought plaintiff had consumed $2,100 of products which plaintiff could agree to pay back to Albertsons at the rate of $25 per week to be taken from subsequent paychecks. Plaintiff wrote and signed the statement.  Plaintiff testified that her job at Albertsons was important to her so she signed the statement for the sole purpose of keeping her job.  Plaintiff testified that if Poe would have advised her that she might lose her job or be suspended if she signed the statement, then she would never have signed.

During the meeting, the door was closed but not locked and Poe sat between plaintiff and the door.  Plaintiff felt that she had to stay and was not free to leave because she had been told

Page 7 - OPINION AND ORDER

to attend the meeting by Martini, the store director.  The meeting lasted approximately three hours.  She never asked to leave the room, use the bathroom, use the phone or get food or drink, and, while never offered any of these amenities, she was never told she could not do any of these things.

During the interview, plaintiff was very nervous and upset at being called a thief.  Plaintiff was also upset at the "highhanded" manner in which the interview was performed, and felt intimidated by Poe.  Plaintiff testified that she wanted to leave the room, but believed that if she did not cooperate she would lose her job.  She was not told that she must stay until she had signed the statement and note.

Plaintiff testified that Poe did not tell her that it was company policy to immediately suspend an employee who admitted violating company policy.  Albertsons' Loss Prevention Investigation Procedures clearly state that "If the investigation has documented evidence that an associate has violated company policy and/or if the associate has admitted to committing violations of policy, the associate should be placed on suspension pending a review of the facts by [other Albertsons' departments]."  Plaintiff testified that she would not have signed the statement if she knew it would result in immediate suspension.

After plaintiff signed the statement, Poe left the room and

Page 8 - OPINION AND ORDER

contacted Kip Stover on the telephone, who was acting as Albertsons' Senior Associate Relations Representative for Oregon during April and May 2005.  Stover instructed Poe to have Martini immediately suspend plaintiff pending further notice.  On May 16, 2005, while still suspended, plaintiff was informed by Martini that her employment with Albertsons was terminated.

At the time of plaintiff's termination she was 60 years old.  Prior to termination, plaintiff had planned to continue employment with Albertsons until she reached age 66, an age identified by plaintiff that would secure a monthly social security amount that provided her with adequate support.

Plaintiff testified that she experienced emotional distress subsequent to the interview and termination.  She left the meeting, went home and cried for the rest of the day and could not sleep the entire night.  Plaintiff continued to have sleep problems for an extended period of time, and she has nightmares about the interview and the loss of her job.  Plaintiff testified that even now, if she relives the events in her mind she has difficulty sleeping as a result.  Plaintiff testified that she did not seek counseling or medical attention because she had lost her medical insurance and did not have the funds to obtain counseling.

On July 25, 2005, plaintiff filed a complaint with the Oregon Bureau of Labor and Industries (BOLI) alleging termination

Page 9 - OPINION AND ORDER

due to age and religious discrimination by store director
Martini.  On September 27, 2005, BOLI dismissed plaintiff's
religion and age discrimination claims based on its finding that
the sole basis for the termination was the taking of products
from the Albertsons store without paying for them.  The BOLI
investigator concluded that plaintiff had not provided sufficient
evidence to show she was treated differently and/or discharged
because of her protected classes.

Plaintiff filed an amended complaint in this court on
February 13, 2006, alleging claims for intentional infliction of
emotional distress, fraud, and false imprisonment.  She seeks
non-economic damages for each claim, in addition to economic
damages from the fraud claim.

## DISCUSSION

A.   Intentional Infliction of Emotional Distress Claim

Plaintiff's first claim for intentional infliction of
emotional distress arises from the loss prevention meeting with
Albertsons' employees Poe and Booth, and plaintiff's subsequent
suspension and termination.

To state a claim for intentional infliction of emotional
distress under Oregon law, a plaintiff must establish that (1)
the defendant intended to inflict severe emotional distress on
the plaintiff; (2) the defendant's acts, in fact, caused
plaintiff to suffer severe mental or emotional distress; and (3)

the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.  McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 84 (1995)(en banc).

1.   Extraordinary Transgression

Because of the threshold nature of the extraordinary transgression element, I will consider that element first.  A court considers whether conduct is socially tolerable on a case-by-case basis, considering the totality of the circumstances involved.  Buckel v. Nunn, 133 Or. App. 399, 404, 891 P.2d 16 (1995).  Conduct that is merely rude, boorish, tyrannical, churlish, and mean does not satisfy the standard.  Watte v. Edgar Maeyens, Jr., M.D., PC, 112 Or. App. 234, 239, 828 P.2d 47 (1992).  As part of its assessment, the court must consider whether a special relationship existed between the parties.  MacCrone v. Edwards Center, Inc., 160 Or. App. 91, 100, 980 P.2d 1156 (1999).  An employee-employer relationship is considered a "special" one.  MacCrone, 160 Or. App. at 100; Bodewig, 54 Or. App. at 486.  The existence of a special relationship may tip the balance in favor of finding socially intolerable conduct.  Campbell v. Safeway, Inc., 332 F. Supp. 2d 1367, 1377 (D. Or. 2004).

Plaintiff testifies that the meeting with loss prevention management lasted for three hours during which plaintiff did not use the restroom or the phone, and was not given food or drink.

While plaintiff did not explicitly ask for any of these amenities, she testified that neither were they offered. According to plaintiff, the meeting was styled by Poe as an opportunity for plaintiff to demonstrate her loyalty to Albertsons by helping them to identify employees who had consumed food products.

Initially, plaintiff denied ever eating saleable product. Poe told plaintiff that a security camera caught plaintiff eating products; however, the record does not reflect any testimony as to the contents of such a tape. During the meeting, plaintiff was under the impression that she was helping to solve Albertsons' problem by becoming "part of the solution" and leading by example (i.e. not eating any products, even if out-dated or non-saleable). As a result, she agreed to write a statement and sign a "promissory" note. The statements written by plaintiff and other employees interviewed by Poe and Booth are nearly identical in form and content. Plaintiff's statement says that she is "willing to repay that amount [$2100] to Albertsons @ 25.00 weekly." Plaintiff further writes that "I promise from today on, the policy violation will stop and not happen anymore. I will take appropriate action against those I witness by reporting to store director directly."

The crux of plaintiff's claim is that Poe led her to believe that she had a future at Albertsons if she wrote a culpatory

statement and signed a note acknowledging that she had consumed food products without paying for them and promised to help stop the store-wide practice. Plaintiff alleges she was led to believe that she was acting as a team player by becoming part of the solution. As a result of her statement, however, plaintiff was immediately suspended and then terminated one week later.

Due to the meeting, suspension, and termination, plaintiff has experienced crying and sleeplessness. She continued to have sleep problems for an extended period of time, and she has nightmares about the interview and the loss of her job. Plaintiff testified that even now, if she relives the events in her mind she has difficulty sleeping as a result.

Oregon courts have found cognizable intentional infliction of emotional distress claims in the employment context. The Oregon Supreme Court found an extraordinary transgression of social standards in the way a department store interrogated an employee suspected of stealing from the store's cash register. Hall v. May Department Stores, 292 Or. 131, 133, 637 P.2d 126 (1981). There, the court determined the record allowed a jury to find that the security guard "attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part." Id. at 139. The guard told plaintiff that store personnel had proof she was stealing from her registers and that he could not help her

Page 13 - OPINION AND ORDER

avoid jail unless she told the truth. Id. at 140. The court
concluded, "if a jury, drawing all possible inferences favorable
to plaintiff, found an intentionally oppressive method of
browbeating an employee into a confession, it could also decide
that this method went beyond the outer bounds of socially
tolerable employer practices." Id. at 141.

The Oregon Court of Appeals likewise found sufficient
evidence to satisfy the extraordinary transgression element in
cases involving overbearing conduct by an employer. In Buckel,
for example, the court concluded a jury could find the employer's
confinement and interrogation of an employee socially
intolerable. 133 Or. App. at 405. Accused of stealing from the
employer store, the plaintiff employee endured "nearly three
hours of interrogation" in a small storage room where the guard
positioned himself between the plaintiff and the door. Id. at
403-04. During the interrogation, the employer's security guard
gave the plaintiff the choice of confessing or going to jail, but
did not "offer any evidence to corroborate his accusations." Id.
at 402-03. Although the initial investigation led the defendant
to believe only that the plaintiff had stolen money, the
defendant's security guard pressed her into also admitting to
stealing merchandise and lottery tickets despite the lack of
evidence to support such allegations. Id. at 402. In the face
of the employer's relentlessness, plaintiff confessed "only

because she wanted to go home and ... was intimidated by the interrogation." Id. at 404-05. Confronted with these facts, the court believed "a jury could conclude that defendant's conduct exceeded the bounds of social toleration." Id. See also, Campbell, 332 F. Supp. 2d at 1378 (jury could find defendant used "browbeating" that constituted socially intolerable conduct where a material fact existed about whether plaintiff could be blamed for stealing $800.00, while defendant only reasonably believed she had stolen $60.00, plaintiff did not have a chance to challenge the accusation because defendant told her she would go to jail if she raised any objection, and defendant responded to plaintiff's denials with a threat of physical violence).

These cases illustrate conduct that is recognized in Oregon as creating a jury question as to whether the employer's conduct is socially intolerable. In each of these cases, while the employer may have had some evidence of theft, the employer never reasonably believed the plaintiffs had actually stolen the large amounts of money finally admitted to through various forms of "browbeating." In all three cases, the employers' security guards conducted the interviews, and a common tactic utilized was to threaten that the employee had only two choices: confess everything or go to jail.

Here, the interview was conducted by two individuals of different sexes from Albertsons' Loss Prevention Department. Poe

never threatened that plaintiff's only options were to confess or go to jail. Plaintiff was never threatened with physical violence. She may, however, have been coerced into confessing to eating more products than she actually did. Poe wanted plaintiff to believe that if she admitted eating products, she would be helping to solve a loss prevention problem for her employer.

At the time of the incident, plaintiff was 60 years old, and had been working at Albertsons for 14 years. In light of the employer-employee relationship, plaintiff's willingness to "set an example" for other employees, and Poe's interview tactics, plaintiff might have been vulnerable to Poe's requests for her to write the culpatory statement and sign a "promissory" note. While Poe's tactics may have been unfair and overbearing, given the status of Oregon case law discussed above, I find that Poe's actions do not rise to the socially intolerable conduct exhibited by the "browbeating" security guards threatening jail in <u>Hall</u>, <u>Buckley</u>, and <u>Campbell</u>. As such, I conclude that Poe's conduct does not rise to an extraordinary transgression of socially tolerable conduct.

Therefore, plaintiff's claim for IIED based on her suspension and termination fails and defendants' motion for summary judgment on this claim is granted.

B.    Intentional Infliction of Emotional Distress Claim

Plaintiff also pleads a claim for IIED based on defendant

Jackie Martini's "religious and age-related comments" towards plaintiff.  Plaintiff testified that Martini commented that plaintiff was a "work horse" but that they needed to find a way "to get [plaintiff] retired."  Martini also gave plaintiff a religious pamphlet directed to department heads by Albertsons that offended plaintiff.  At other times, Martini denounced plaintiff's lack of computer skills, and gave her a poor performance review.  Finally, Martini stated that she had been sent to the Bend store "to clean it up," which made plaintiff feel that she was on Martini's hit list.

Martini's comments and the pamphlet distributed by Albertsons to all department heads fail to rise to the level of an "extraordinary transgression of socially tolerable conduct." While Martini's comments to plaintiff may have been thoughtless and even rude, they fail to rise to the level of socially intolerable conduct.  Similarly, while the pamphlet distributed by Albertsons to department heads may have been promoting a particular religious point of view, it also fails to rise to the level of socially intolerable conduct.

Thus, defendants' motion for summary judgment is also granted as to plaintiff's IIED claim arising from Martini's comments and Albertsons' employee pamphlet.  As such, I need not consider the alternative issues raised by defendants that the BOLI finding of no discrimination precludes plaintiff's claim,

Page 17 - OPINION AND ORDER

and that Martini was fraudulently joined as a defendant.

C.   Fraud Claim

To succeed on a fraud claim under Oregon law, a plaintiff must show by clear and convincing evidence that (1) defendant made a false representation of a material fact; (2) with knowledge or belief that it was false, or with an insufficient basis for asserting that it is true; (3) with the intent that plaintiff rely on it; (4) plaintiff justifiably relied on the misrepresentation; and (5) plaintiff suffered consequent damages.[1] Arboireau v. Adidas-Salomon AG, 347 F.3d 1158, 1165 (9th Cir. 2003).  See also Pollock v. D.R. Horton, 190 Or. App. 1, 20, 77 P.3d 112 (2003).

It is well established in Oregon that without some contrary agreement, an employment contract is terminable at the will of either party.  Albrant v. Sterling Furniture Co., 85 Or. App. 272, 278, 736 P.2d 20 (1987).  This means that an employer may generally discharge an employee at any time for any reason.  Id. Even so, the fact that a plaintiff has an employment position that is terminable at-will does not mean that she could not

---

[1]At times the Oregon courts have listed nine elements of fraud, rather than five.  The two versions are almost identical in the proof required.  I will follow the five-element rule as articulated in Pollock because it is less cumbersome and more precisely articulates the nature of the fraud inquiry.  Moreover, the most recent interpretation of Oregon's fraud elements by the Ninth Circuit utilized the five-element formulation. See Arboireau, 347 F.3d at 1165.

reasonably rely on representations made by the defendant.  Id. at 275-76.

Defendant Albertsons argues that plaintiff cannot establish a cause of action for fraud because (1) plaintiff is an at-will employee whom Albertsons may terminate for any reason, and thus by definition a fraud cannot exist; and (2) plaintiff sustained no injury because evidence other than plaintiff's signed statement was enough for management to conclude that plaintiff would be terminated anyway.

I disagree.  Poe made a false representation of material fact when he represented to plaintiff that she had future employment at Albertsons (e.g. requesting plaintiff promise to turn in future policy violators, requesting $25 per week from plaintiff without correcting the natural presumption that such funds would come from future Albertsons checks, and repeatedly emphasizing the non-punitive nature of his inquiry), but asked plaintiff to sign a statement indicating she had violated Albertsons' policy.  Per Albertsons loss prevention policy, such an admission by an employee results in an immediate suspension.

Likewise, Poe knew or should have known that his representations were false because Albertsons' Loss Prevention Investigation Procedures clearly state that "If the investigation has documented evidence that an associate has violated company policy and/or if the associate has admitted to committing

violations of policy, the associate should be placed on
suspension pending a review of the facts by [other Albertsons'
departments]."  Given this evidence of his department's policies
regarding investigations, Poe knew or should have known that his
representations to plaintiff were false.

It is clear that Poe intended plaintiff to rely on his
misrepresentations because he requested and received a signed
statement by plaintiff that she had eaten products, even though
at the beginning of the interview she insisted that she had only
eaten out-of-date and non-saleable products, as had become the
custom in the Bend store.  Poe's interviewing techniques were
successful in that he suggested that if plaintiff were a part of
the solution (i.e. admitting that eating any products was against
policy), then she was a good department head who could lead by
example into Albertsons future.

Finally, plaintiff was damaged by Poe's misrepresentations
because she was immediately suspended and then terminated.  Thus,
at a minimum, plaintiff was damaged in the amount of her unpaid
wages between suspension and termination because Poe knew of
Albertsons immediate suspension policy.  Albertsons argues that
because other employees had identified plaintiff as eating
product, Albertsons had "other evidence" upon which to suspend
and terminate plaintiff.  I agree with Albertsons' argument in
that Albertsons may indeed have had "other evidence" upon which
to ground termination.  However, I find that a question of fact

Page 20 - OPINION AND ORDER

remains.  Albertsons asserts that because other employees identified plaintiff in their own statements, Albertsons would have terminated plaintiff anyway.  The former store director, however, who was head of the meat department at the time of plaintiff's interview, was also identified in the statements of plaintiff and Michael Jensen.  Mr. Lowry testified that he is still employed by Albertsons in a different Bend store, and thus was not terminated as a result of the Bend store reorganization even though similar "other evidence" existed as to the products he ate.  Thus, at the very least, there is a question of fact as to whether plaintiff would have been suspended and terminated had she refused to draft and sign the statement as directed by Poe.

I find that genuine issues of material fact exist as to plaintiff's fraud claim.  Therefore, defendants' motion for summary judgment as to plaintiff's fraud claim is denied.

D.   False Imprisonment Claim

False imprisonment is the unlawful imposition of restraint on another's freedom of movement.  Buckel, 133 Or. App. at 405. Restraint may be accomplished by actual or apparent physical barriers, compulsive physical force, a threat to apply physical force, or assertion of legal authority.  Id.  The restraint need not be more than a brief time.  Id.

Oregon statutory law provides a merchant's exception to a false imprisonment charge.  ORS § 131.655(1)(a) allows a person to be detained in a reasonable manner and for a reasonable time

Page 21 - OPINION AND ORDER

by a merchant or a merchant's employee who has probable cause for
believing that the person has committed theft of property of a
store.  The question of whether a merchant has reasonable cause
for detaining a person is one of law for the court to determine
if the facts are undisputed.  ORS § 133.310.  The question
whether the confinement was reasonable in manner and time is an
issue for the jury unless the court determines that even
accepting the evidence most favorable to plaintiff, the detention
was reasonable.  Campbell, 332 F. Supp. 2d at 1373.  Thus, under
Oregon's statutory merchant's exception, the existence of
probable cause does not inherently shield the merchant from tort
liability for false imprisonment.  The confinement must have
occurred in a reasonable manner and for a reasonable time.  Id.

Plaintiff was directed by Martini to go to the store
director's office where she was interviewed for three hours by
Poe.  The door was closed behind plaintiff upon entering the
office, and plaintiff felt that she had to stay and was not free
to leave.  Plaintiff did not leave the room to go to the bathroom
or to get food or drink, and was not told that she could leave
until after she had signed the culpatory statement and note.

The court must first inquire into whether confinement
occurred.  At the beginning of the interview, plaintiff was not
confined because she voluntarily went to the store director's
office.  Because the door was not locked and Poe was not blocking
plaintiff's exit, physical confinement did not exist.  Plaintiff,

Page 22 - OPINION AND ORDER

however, felt that she could not leave without losing her job, and she was not told she could leave - until after she signed the culpatory statement and note (i.e. after 3 hours had passed).

Even considering the facts in a light most favorable to plaintiff, Poe's statements or actions did not serve to actually restrain plaintiff. Poe did not position himself in a way to "block" the door, and though plaintiff alleges that she did not feel free to leave, plaintiff acknowledges that this was because she did not want to lose her job, not because she felt physically restrained from leaving. The nature of the confinement is such that a plaintiff must feel that she cannot leave the room, under some threat of force or coercion. See, e.g., Buckel, 133 Or. App. at 406 (allowing jury to decide confinement issue where plaintiff testified she "did not feel free to leave, and "security guard "positioned himself between [plaintiff] and the door"); and Campbell, 332 F. Supp. 2d at 1374 (finding confinement where employer placed chair so as to block exit, threatened to use physical force against plaintiff, and threatened that plaintiff would be taken to jail if she did not sign a confession).

Those are not the circumstances here. Plaintiff's interview was conducted during her normal daytime shift, and there was no evidence during the interview that Poe would have stopped plaintiff from going back to work or leaving the premises. While Poe may have been trying to create an intimidating environment,

Page 23 - OPINION AND ORDER

plaintiff has not provided evidence that Poe did so in a way that physically restrained, or in any way confined plaintiff.

I further note that even if confinement were found, plaintiff's claim of false imprisonment fails due to ORS 131.655, the merchant's exception.  While three hours is a long time to ask questions of an employee, it was not so long that plaintiff asked to go to the restroom, make a phone call, or get food or drink.  While plaintiff indicated that Poe repeated and reinforced his goal of trying to solve Albertsons' loss prevention problem in a way that made plaintiff fear the repercussions of not cooperating (i.e. losing her job), such "confinement" was not unreasonable in time or manner given the nature of the inquiry (i.e. changing a store's customary conduct).

Therefore, plaintiff's claim of false imprisonment is dismissed.  Defendants' motion for summary judgment on this claim is granted.

### CONCLUSION

Albertsons' motion for summary judgment (doc. 24) is granted in part and denied in part as follows: defendants' summary judgment motion is granted as to plaintiff's claims for IIED and false imprisonment, those claims are dismissed.  Defendants' motion is denied as to plaintiff's claim for fraud.

///

///

Page 24 - OPINION AND ORDER

IT IS SO ORDERED.

     Dated this  27  day of April 2007.




                             /s/ Ann Aiken
                               Ann Aiken
              United States District Judge